but it's 196129, and we'll hear from Mr. Gares. Thank you, Your Honor. May it please the Court. My name is Stephen Gares, and I have the pleasure of representing the underlying defendant, who are the appellants in this case, Sheriff Almaguer in his individual capacity, and Undersheriff Robertson in his individual capacity as well. This is a qualified immunity interlocutory appeal. The plaintiff or appellee's underlying claims which survive summary judgment, there's two in total. The first is that plaintiffs claim that he was denied equal protection of law due to his sexual orientation and or the race of his son. And he's claiming that was done by the refusal of the defendant appellants to accept formal complaints from the plaintiff regarding things that were happening in the town of Hitchcock, which is a very small community there in the county for which Sheriff Almaguer and Undersheriff Robertson are employed. The second claim is a conspiracy claim under 42 U.S.C. section 1985 subsection 3, both a federal claim and then a subsequent Oklahoma conspiracy claim as well. In order to show a plaintiff, there is no general constitutional right to police protection, but an equal protection claim can arise from a failure to protect if a plaintiff establishes three elements. One, that he is a member of a protected class, or two, that he was treated differently from similarly situated individuals who were not members of the protected class, or three, and three, the officer's failure to protect was motivated, at least in part, by a discriminatory purpose. Now, the Appellees Council has made great lengths and argument with regard to arguments brought by the appellants that are based on facts, and so I want to address that first. In the case, the Supreme Court case of Scott G. Harris, the Supreme Court indicated that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. In fact, the Supreme Court in Scott G. Harris overturned both the Court of Appeals and the District Court in that matter based on a factual review of the record. Particularly, the underlying District Court in this case, with regard to disparate treatment, element number two, found that plaintiff has offered evidence that the defendants declined to allow him to file a formal report or complaint as to various of the alleged incidents to which he objected, suggesting they were unwilling to pursue his complaint. The court also stated there is also evidence that the defendants took and sought written reports from others who were arguably similarly situated. Specifically, the complaints reports received from Ms. Paul, a participant in one of the same incidents. I think it's important to point out that on the morning of the fire of Plaintiff's House, which was May 29, 2017, neither Sheriff Almaguer or Under Sheriff Robertson had taken any reports from anyone in the town of Hitchcock or the plaintiff. As of that early morning, there had been one report that was taken by Deputy Reed that was made by Janita Pauls with regard to a trespassing claim, which happened on May 22nd. Sheriff Almaguer and Under Sheriff Robertson were not involved in that, and the totality of the report was two sentences long and was a claim that Janita Pauls had made that Mr. Gamble-Medler had come on her property and put a sign on her property with regard to a notice that he was making as town clerk for the community. As of the morning of the fire, there were three statements that were made that morning. One of them was the plaintiff's voluntary statement that he himself hand-wrote and contained three claims, a claim that he was being stalked by Mr. Pauls, a second factual recitation of the facts surrounding the fire at his home, and a third claim that Janita Pauls had threatened his son. The other two statements that were made that morning were by two EMS workers who were on standby at the time of the fire at Plaintiff's home, and those two EMS workers made statements about things that the plaintiff had said during the fire. Plaintiff has not made any claim against those two people. There's no earlier claim by those two people. Anna Shetler and Simmons were those two individuals, and so there was no earlier claim. Later that morning, the undersheriff, in investigating both the fire and the claims contained in plaintiff's statement, went to Joel Pauls and took his statement. The next day, he went to Janita Pauls and took her statement, and then the next day, two days after the fire, he took a statement from plaintiff's pastor. Undersheriff Robertson's report is also full of people that he talked to with regards to alibis that were established as plaintiff was claiming somebody burned down his house. Now, it's important to point that out because the court found, with regard to the disparate treatment, that there was evidence that the defendants took and sought written reports from others who were arguably similarly situated. However, that finding is plain error and is blatantly contradicted by the record because those reports that were taken from other people, particularly Ms. Paul, were done subsequent to the plaintiff's statement that was made on the morning of the fire. There was no disparate treatment because, at that point, there had been no other statements that were received by any of these other previous defendants. As a result of Undersheriff Robertson's investigation in this case, he was able to take pictures of the offensive sign that the plaintiff had raised, the one, forgive my language, that said, hey, queer, $500 fine for trespassing. He photographed that and later sought guidance from the district attorney as to whether or not that consisted of hate speech or a crime, which the DA told him that it did not. Undersheriff Robertson then gathered all the other evidence and took it to the DA, and then charges were sought and established by the district attorney's office for the claim, for the statements that Mr. for the plaintiff, Gamal Medler, had made at the scene of the fire and earlier with regard to what happened with Janita Pauls. But those were all subsequent investigations that were taken after the original statement was made by the plaintiff. The next issue by the court was whether the plaintiff had presented sufficient evidence with regard to whether the defendant's actions were motivated by discriminatory purpose. And one of the things that's very important in that regard is that there were two alleged discriminatory issues, the sexual orientation of the plaintiff by being gay and the race of plaintiff's son and his association with his adopted son, who happened to be black. The court acknowledged in the lower court ruling that the potential liability of each defendant must be evaluated separately. So the question is whether there was sufficient evidence to support a reasonable inference that these defendants' actions were motivated by racial or sexual preference animus. The court acknowledged there was nothing in the submissions which even approached direct evidence of such animus and then further acknowledged that discriminatory purpose must commonly be established by circumstantial rather than direct evidence. However, when the court looked at that evidence, the court said that there were multiple refusals to accept complaints from plaintiffs while accepting complaints in arguably similar circumstances from others not gay or not having the racial association bond. However, as mentioned earlier, if you look at the timeline of those complaints and when they were taken, the actual written complaints, plaintiff was the first to raise three separate issues, the alleged stalking, the fire, and this threat to his son, which were subsequently investigated by under Sheriff Robertson. Those statements, just for the record, can be found in the appendix at pages 440, 447, through 451, 459, and 469. Mr. Gary, with the explanation that was given to Mr. Gamble-Medler for the complaint about Joneeta Paul's, was the explanation that Judge Keeton credited for purposes of summary judgment that Joneeta Paul's threat was protected by the First Amendment? Well, that is plaintiff's claim that he was told that... And he testified to that, right? Yes, he testified to that, that he was told... And Judge Keeton said that that was the explanation, that a reasonable fact finder under the standard in Rule 56 could reasonably infer that that was the explanation that was given to him, right? That's correct. But if you look at the plaintiff's statement that he wrote, his handwritten statement, he indicated that he talked to a gray-haired deputy who said that he would take care of it. And so, it's confusing as to whether the plaintiff... Because at the time he wrote the statement, under Sheriff Robertson, the sheriff and Deputy Consimi were all there with him. Certainly, he would have recognized one of those individuals. But regardless, the court did address that. If that is the reason, and the court says it is so, that they left in the discriminatory animus claim, that claim would only be towards the racial claim, and not towards the claim that plaintiff's sexual orientation was the basis of the discriminatory animus. And we believe that the court could have at least filed or granted summary judgment with regard to the discriminatory animus claim based on the sexual orientation, and left the alleged race-based claim, and not lumped them both together, and that the court should have divided that. So, with your... Kevin, is that... Is that indicate that he's out of time? No, that's the three-minute mark. Okay, sorry. So, let me ask you a follow-up question. I want to make sure I understand what you're saying, Mr. Gary. So, are you saying that... Well, first of all, a true threat is not protected by the First Amendment. So, the explanation that was given to Mr. Bedlar of why the sheriff and under-sheriff Robertson were not going to take a complaint against Jodita Paul, that was just a legally incorrect explanation, right? Because that's just flat-out incorrect. A true threat is not protected by the First Amendment. Do you agree with that? I do agree. So, we can reasonably infer that... Did you say that the 1983 claim with regard to discrimination based on sexual preference, that Gamble Bedlar was entitled to proceed... to overcome summary judgment based on sexual preference on that part of the 1983 claim? Well, overcome maybe as to the race claim, but not the sexual orientation. The race claim. Okay, so are you dropping that part of your appeal? No, Your Honor, because the facts show that the plaintiff did make that claim with regard to that racial issue and what was told to... allegedly told to him by Jodita Paul. He did make that claim in his written statement, which is found at page 440, and it was investigated by Under Sheriff Robertson following the fire, and that's what led to the subsequent statements made by Jodita Paul, Joel Paul, and others that were in this case. So, it was ultimately investigated, albeit after the fire, but well before this lawsuit was filed. Okay, but so the sheriff tells Gamble Bedlar that, well, after investigating, I'm not going to take a complaint against Jodita Paul because what she did, threatening, was protected by the First Amendment, but I am going to actually affirmatively prosecute you for doing exactly the same thing that he was complaining that Jodita Paul had done, that the sheriff didn't prosecute Gamble Bedlar for making a threat, right? I believe that plaintiff's claims in this case are not based on the failure to prosecute. They're based on the refusal to accept a formal complaint, not on the failure to prosecute, and so his claim is that we refused to take his complaint originally with regard to the threat against his son, but then we did, but then we prosecuted him, but the fact of the matter is, he was allowed to make that report, and he did make that report, and it was investigated, and so even though the sheriff relied on a misstatement of the law when he told Gamble Bedlar at first, well, that's protected. We can't do anything about the racial statement that Jodita Paul allegedly said. It was later investigated by the sheriff's office, and when those subsequent crimes that were committed by Gamble Bedlar were discovered, and we got the statements from, we, the defendants got, received the statements from Jodita Paul and Joel Paul, that information was provided to the district attorney's office, and the district attorney's office is the one who decided to pursue those charges against Gamble Bedlar. Okay. Well, very good. You know, I took away your last several minutes in questions, so I'm going to give you 30 seconds to finish up and then ask my colleagues if they have any questions. So you've got 30 seconds to make any closing remarks. Thank you, Your Honor. The thing that I want to mention to the court is with regard to the qualified immunity. The court's total reliance and the reason why they denied qualified immunity was based on the Price v. Cornelius case, and the thing I want to mention about that is Price was completely decided based on the Watson case, and on page 114, I'm sorry, 1114 and 1115 of the Price-Cornelius opinion, and it says, Watson reached this conclusion specifically in the context of addressing police protection afforded to domestic abuse victims. Watson, therefore, was sufficient to put Brooks on notice that providing Price-Cornelius and less police protection than other domestic violence victims because she is a lesbian would deprive her of equal protection of the law, at least in the absence of articulated rational government reason for such discrimination. Why that is important is the district court relied on a broad general proposition of law in analyzing whether the appellants were in violation of clearly established law, but it's clear that both Watson and Price-Cornelius were limited to equal protection of law with regard to homosexual victims of domestic abuse, and we don't think that that would expand into this case where there is no domestic abuse whatsoever, and so we don't believe that it's clearly established. Okay, well, thank you very much, Mr. Gary. Judge Murphy, do you have questions for Mr. Gary? Mr. Gary, did you, in the lower court, indicate that the district court should split the claim so that it was... you should grant your motion as sexual orientation, but not as to the racial discrimination? Did you make that claim below? Your Honor, as I look back in the file, I don't see that we clearly tried to separate them. However, based on plaintiff's claims, they are an and-or provision. You've answered my question, thank you. Thank you, Your Honor. Okay, Judge Murphy, do you have anything else? No. Okay, Judge Moritz, do you? I don't have any questions, thank you. Okay, thank you. Mr. Gary, I don't... I've already bothered you with all my questions, so I'll turn to Mr. Hammonds for the appellate. Thank you, Your Honor, and if it may please the court, my name is Mark Hammonds. I represent the appellee in this case, Mr. Randy Gambler-Medler. And in this particular case, Mr. Medler and his spouse, who is also male, moved to the small town of Hitchcock with their adopted African-American son. Hitchcock is a very small community, you know, only about 100 people, maybe 110. And as might be expected, once they got there, there were members of that community who were not welcoming. Mr. Medler encountered what he felt were a number of threats of violence against himself and his son, and he attempted to report those to take the initial steps of securing police protection for himself and for his son and for his family. In the summary judgment response, we showed that there were three separate instances where he went in and attempted to file reports of such conduct with the sheriff and with the undersheriff. And in each instance, he was told that they would not accept such a report. Now, in contrast to that, the sheriff had testified that the practice for the citizens of Blaine County is that any person can come in and make a report about any matter that concerns them. The sheriff said in his motion on summary judgment, as any other citizen's plaintiff has the right to file a police report or complaint with the Blaine County Sheriff's Office regarding any incident. That's found at the appendix, page 1420, at fact number six of the brief. So there was evidence of a number of instances, and I think the sequence and the context which is being argued in this case do not reflect the fact that the only time they took a report from Mr. Medler is at a time when they were investigating him because they suspected him of burning down his own house. In that case, they asked him to write a statement, and in that statement, he included complaints he had previously attempted to make and that the sheriff and the undersheriff, by his testimony, which has corroboration from the testimony of other individuals that we recited, were refused. Now, what the defendants are arguing is that this court should go back and parse the factual history of the pleadings and the motions and make its own decision about what facts the court should have found. That is not authorized as part of the qualified immunity analysis. Under qualified immunity, the only proper purpose is to look at whether the law is clearly established, not to revisit the facts. Now, they cited Scott v. Harris, but Scott v. Harris is a greatly different situation. It involved the question of where there is a videotape that showed an occurrence, a high-speed chase, and whether or not the driver who is bringing that lawsuit could create a factual issue by his testimony contradicting a videotape when the authenticity and accuracy of the videotape were not questioned. And the Supreme Court said, no, there are certain circumstances where you simply cannot credit someone who is testifying contrary to an undisputed fact, or evidence that is undisputable. That is not the situation where you have different people testifying about different sequences of events and different facts, as is the case here. As a matter of fact, this court in McCallum v. Morales, 945 Fed 3rd, 1276 at 1282 Note 3, explained that. It went through and said, you can use the rule in the Scott case, but not when the differences are based on the testimony of different individuals. Here, the appellants are trying to say, you have to credit our view of the sequence, our view of the evidence, and ignore the contrary testimony of the plaintiff as to matters that really are matters of credibility. And the ordinary rule of summary judgment, which applies on qualified immunity, is that the court doesn't decide credibility issues. It simply determines whether a disputed material facts. So the analysis that the defendants, excuse me, the appellants are relying on, is one that simply is not available to them on a qualified immunity analysis. You know, in their reply brief, the appellants specified that their appeal is a factual appeal, with one exception which I'll address in a moment. At pages 6 and 7 of their reply, they summarize their arguments and say, what the appellants are arguing is that the district court committed plain error with regard to its findings, that there was evidence of discriminatory intent. That its factual findings are blatantly contradicted by the record, and that the contours of the allegedly violated constitutional rights in this case were not clearly established. The first two parts of that are simply factual arguments, which the court does not entertain on a qualified immunity argument. The last argument that they made, and the only argument that I found reading through their brief, is that the law was not clearly established that you could infer discriminatory intent from differences in treatment. They made the argument that you could not use the multitude of case law from this circuit and elsewhere, stating that differential treatment can give rise to an inference of discriminatory intent, because that wasn't decided in an equal protection setting. That argument, which was not made at the district court level, is not supported by any evidence or any citation of authority, and is contrary to the Supreme Court's rule that there is no special evidentiary rule that applies to civil rights cases. The court has repeated that many times. They repeated it in Rees v. Sanderson-Plumbing and Desert Palace, in Swierdzki v. Surima. The rule is that general evidentiary rules, the ordinary method by which you prove circumstantially discriminatory intent, apply just as well in civil rights cases as in any other case. And you don't create an issue of law by saying that those evidentiary rules were not used in an equal protection case, particularly when you don't cite any contrary rules, when there's no reason to believe that the general method and manner of proof is different in this case than it is in any other case. Now, the argument, which I do not believe was made at the district court level, and I don't recall seeing in the briefing at this level that Cornelius does not apply and provide guidance, or, excuse me, Price Cornelison does not apply guidance because it involves a domestic dispute, simply does not accurately read the language in the case. Yes, that was the context in which it arose, but the court in both Watson and in Price Cornelison said that the issue was one that the state may not discriminate in providing police protection, not just a particular aspect of police protection, but may not discriminate in providing police protection. The argument, if credited, would be that, well, there is no clearly established right to not be discriminated against on an irrational basis, such as sexual orientation, when it comes to investigating a case, when it comes to receiving a complaint, when it comes to going out on a welfare call, when it comes to any of the other many activities which everyone understands constitute the provision of law enforcement. The defendants below, the appellants here, never disputed that receiving a police report, which is the starting point for getting police protection, is part of law enforcement. They didn't claim to not understand that. As a matter of fact, their argument throughout was not that we don't know that we have to provide this form of law enforcement. Their argument, to the contrary, was that they had not refused to receive reports. That factual dispute is itself indicative of discriminatory intent because, as indicated in Reeves, giving a false explanation, a pretextual explanation, itself can be sufficient to give rise to an inference that the real reason is discriminatory. So when Robertson says, and the sheriff says, that the three instances identified by the plaintiff in this case, he didn't actually come in and seek to make a report, that is the traditional fact question that is decided by a jury, and that's what Judge Heaton properly said below, that they have essentially made their defense, and it's shifted as it's gone on, but their defense at the district court level was essentially, we didn't do it. We didn't refuse to take a report. He didn't offer to make a report. That, again, is a factual question, which has to be resolved in our favor at the summary judgment level. So we think that the only issues involved in this are the proper application of qualified immunity standards, which is that the court will not review their factual arguments, except in the rare case where there's a videotape or something else that directly contradicts a key fact that we are presenting that's essential to our case. That doesn't exist here. What about... Yes, sir. Mr. Hammond, on the 1985-3 claim, with regard to an agreement between the sheriff and under Sheriff Robertson, what evidence is there? Why isn't Judge Heaton's conclusion blatantly contradicted by the record because of the absence of any evidence in the summary judgment record that the sheriff and then the undersheriff actually reached an agreement? After all, for the principal vote of contention about the incident with the three Pauls, I don't think the undersheriff was even there. Well, no, not on the time that that was first communicated, although a report was not taken, but part of the evidence that we presented is that when no report was taken on that oral complaint, that Mr. Gambler-Medler attempted to go and file a report and was refused, and there is some conflict in the record about whether it was the undersheriff or the sheriff who refused to do it. The sheriff saying that it was the undersheriff who had refused, Mr. Gambler-Medler said it was the sheriff who refused. But the testimony that I think the judge relied on was the sheriff's testimony that everything that the undersheriff did, everything that he had performed was in accordance with his expectations and what the sheriff wanted done in those circumstances. So, circumstantially, the sheriff is expressing his approval of the conduct of the undersheriff, and the undersheriff is saying, for his part, that he's doing things the way the sheriff wants it to be done. I think that's the kind of circumstantial evidence from which you can infer an agreement. There does not have to be direct evidence of an agreement. Okay, thank you. Judge Borch, do you have questions for counsel? Judge Moritz? I apologize. Yeah, my question, too, went to the 1985 claim and the evidence of a concerted action between Robertson and Almaguer. And I'm questioning, I guess, still what...  to the question of whether or not you can tell me about any evidence of any concerted action between the two of them. Well, in our view, the concerted action is the refusal of both the sheriff and the undersheriff to take the initial step associated with law enforcement of receiving a report, the step without which nothing else follows, nothing else takes place. The... But just the fact that that occurred is not evidence of a concerted action. And I'm not aware of any authority that would make it so, anyway. Yeah. Can I go forward and answer that? The question, I hear the bell ringing. Please answer. Okay. A concerted action can be shown... I'm sorry, I've had a little trouble. There's a bell ringing that's not our normal bell. Am I the only one hearing that? No, I can hear it. Sorry. Maybe someone else is, yeah. If I can, I think concerted action can be inferred from acting in a common manner on a common subject or the issue that's in question. I don't think there has to be evidence that they sat down and met together and said, we're going to do this. If their actions are common, if they do the same thing in the same circumstances presented with the same issue, then the inference is that they are doing what they had agreed to do, particularly when each side, in this case, both the undersheriff and the sheriff, say, we're doing it the way we understand it ought to be done. The undersheriff's saying, I'm doing it the way the sheriff wants me to do it, and the sheriff is saying the undersheriff is doing what I want him to do. What's your best case to point to an inference in a situation where people are acting in a common manner on a common subject, you can infer that they agreed to act in a common manner. Sufficient to establish a 1985 action. Well, I think the standard for a 1985 action is the same standard for any conspiracy on that. I don't think the case law distinguishes between that. The... Well, part of the elements requires an act in furtherance of the conspiracy, and I think what you're saying that act is is the refusal to take the reports, but you also have to show the conspiracy, not simply the act in furtherance of the conspiracy, and that's the concerted action between the two defendants that I'm not seeing. Your Honor, we address that at page 25 and 26 because it was raised only briefly in the appellant's brief at the district court level. I'm referring to appendix 1663 and 1664. One of the elements of that was that in a common statement a statement made in a group setting within the hearing of Robertson, the statement was, haven't we run you off yet? On the same date, location, and time, Mr. Robertson said to my client, my best advice to you is to tell you and your son to leave. We argued that that was circumstantial evidence of a common plan, at least on the part of Mr. Robertson. Okay. If there are no further questions, I think my time has expired. This matter will be submitted. It will turn to our third case on the...